**HELL'S ANGELS MOTORCYCLE CORP., et al., Plaintiffs,**

v.

**COUNTY OF MONTEREY, et al., Defendants.**

**No. C–99–1512–VRW.**

United States District Court, N.D. California.

March 13, 2000.

Fritz Clapp, Sacramento, CA, for Hell's Angels Motorcycle Corporation, The Oakland Charter of the Hell's Angels Motorcycle Club, plaintiffs.

Karen A. Rodrigue, Office of the City Attorney, Oakland, CA, for City of Oakland, Joseph Samuels, Jr., defendants.

Michael R. Groves, Clifford S. Greenberg, San Jose City Atty's Office, San Jose, CA, for City of San Jose, Jorge Gil–Blanco, William Lansdowne, defendants.

Henry S. Hewitt, Edwin J. Wilson, Jr., Erickson Beasley Hewitt & Wilson, Oakland, CA, Douglas C. Holland, D. Richard Barelli, Office of the County Counsel, Salinas, CA, J. Michael Hogan, Office of the County Counsel, Salinas, CA, for County of Monterey, Dean D. Flippo, James D. Brown, defendants.

Derrick K. Watson, U.S. Attorney's Office, San Francisco, CA, for Michael J. La Plante, defendant.

Gail Killefer, U.S. Attorney's Office, Criminal Division, San Francisco, CA, Scott T. Nonaka, U.S. Attorney's Office, San Francisco, CA, Derrick K. Watson, U.S. Attorney's Office, San Francisco, CA, for Timothy McKinley, defendant.

## ORDER

WALKER, District Judge.

This action arises out of a March 1998 law enforcement raid of the Hell's Angels headquarters in Oakland, California. Plaintiffs Hell's Angels Motorcycle Corporation and Oakland Chapter of Hell's Angels Motorcycle Corporation bring claims for violation of members' federal constitutional rights against a federal agent, Timothy McKinley, and federal fictitious-name defendants pursuant to *Bivens v. Six Unknown Named Agents,* 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Plaintiffs make similar claims under 42 U.S.C. § 1983 against the County of Monterey and the City of San Jose, two named local law enforcement officers and additional fictitious-name defendants. Defendants County of Monterey, Monterey district attorney's office investigator James D. Brown and FBI special agent Timothy McKinley have moved to dismiss the claims against them. The City of San Jose and San Jose Police Officer Jorge Gil–Blanco join in the Monterey defendants' motion. The court heard oral argument on these motions on December 16, 1999.

### I

On a motion to dismiss, the court accepts as true the plaintiffs' version of the facts. *Pareto v. FDIC,* 139 F.3d 696, 699 (9th Cir.1998). A summary of that version follows.

On March 27, 1998, officers of defendants County of Monterey and City of San Jose, including defendants Brown and Jorge Gil–Blanco, executed a search warrant at the Hell's Angels clubhouse in Oakland in connection with murder and robbery investigations. First Amended Compl (Doc 22) ¶ 28. The warrant, issued three days earlier by Municipal Court Judge Terrence Duncan, identified for seizure (1) "security files" and dossiers with information on members; (2) notes and minutes of club meetings; (3) documents containing information concerning the expulsion of a particular member or information regarding the robbery of that member and the "disappearance/homicide" of another member; (4) computers and electronic storage devices and (5) "[i]tems tending to show a confederation of individuals *** known as the Hell's Angels Motorcycle Club." See Decl of Donte Foronda in Support of County Def Motion to Dismiss (Doc 30) at Exh 3. The search resulted in the seizure of two truckloads of club property. FAC ¶ 28. These items were inventoried and removed to a County of Monterey storage facility. Id. ¶ 31.

Defendant McKinley attended the search. See Def Timothy McKinley's Response to Court's Question Posed on Dec. 16, 1999 (Doc 42) at 2. On May 14, 1998, McKinley obtained a federal administra-

tive subpoena for certain seized documents for use in an FBI investigation of the Hell's Angels. FAC ¶ 33. Defendant Brown and other local officials complied with the subpoena and transferred custody of various documents to the FBI on May 22, 1998, four days before a municipal court judge signed a transfer order prepared by the deputy district attorney. Id. ¶ 35. The FBI returned these documents to Monterey on August 7, 1998, and most items were released to plaintiffs three weeks later. Id. ¶¶ 36–37. None of the items seized was used in the subsequent prosecution of the robbery and murder. Id. ¶ 38.

II

As an initial matter, plaintiffs' first amended complaint, which asserts eight causes of action, suffers from a smörgaşbord approach to pleading. The first, second, third and seventh causes of action (as do all the others) re-allege the factual recitals of the complaint, but then these causes of action attempt to predicate liability on multiple provisions of law. Counsel seems to have overlooked that each cause of action should allege a single set of facts and one legal theory. Furthermore, the causes of action do not make clear against whom they have been brought. Ordinarily, these defects alone would warrant dismissal of the entire pleading with leave to amend in order to correct these rather gross fundamental deficiencies.

Plaintiffs, however, have conceded that several claims should be dismissed, substantially narrowing the claims at bar. Furthermore, the complaint appears to raise a novel and important issue regarding the interplay of the Fourth Amendment and federal administrative subpoenas, namely: When an administrative subpoena commands the production of property seized by local law enforcement officials pursuant to a warrant, does the Fourth Amendment require that the property owner be given notice and an opportunity to challenge enforcement of the subpoena? Section III takes up this issue, but first some housekeeping.

The concededly defective causes of action are: (1) the first cause of action for violation of plaintiffs' First Amendment right to free association; (2) the sixth cause of action for conversion under California law; (3) the seventh cause of action for violation of the Fourth Amendment insofar as it alleges judicial deception in obtaining the warrant and (4) claims based on 42 U.S.C. sections 1985(3) in plaintiffs' second, third and seventh causes of action. By agreement of the parties these claims, therefore, are DISMISSED with prejudice. As plaintiffs have consented to dismissal of the section 1985(3) claims and do not object to dismissal of the section 1986 claims for conspiracy to violate section 1985(3), those claims too are DISMISSED.

■ Plaintiffs' eighth cause of action alleges a conspiracy among the federal and state agents to deprive plaintiffs of their constitutional rights. Defendants argue that the complaint does not set forth "specific and material facts which would support a finding that these individuals had an agreement or meeting of the minds' to violate plaintiffs constitutional rights." Rep Mem in Support of Def Motion to Dismiss (Doc 33) at 10. In *Woodrum v. Woodward County, Oklahoma*, the Ninth Circuit held that mere conclusory allegations of conspiracy were insufficient to state a claim under section 1983. 866 F.2d 1121, 1126–27 (9th Cir.1989). The court concludes that plaintiffs' allegations are merely conclusory. Therefore, defendants' motion to dismiss plaintiffs' eighth cause of action is GRANTED.

■ Plaintiffs' third and fourth causes of action seek to impose section 1983 liability on the County of Monterey and City of San Jose. Local governments are not vicariously liable under section 1983 for acts of their employees; in order to state a claim, plaintiff must allege a direct causal link between a municipal policy or custom and the constitutional violation at issue. *Monell v. Dept. of Social Services of City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Plaintiffs' fourth

cause of action contains a general allegation that defendants maintained an unconstitutional policy or custom. Defendants have not moved to dismiss this claim.

■ Plaintiffs' base their third cause of action on the so-called "failure to train" theory: that if a concededly valid policy is unconstitutionally applied by a municipal employee, the city is liable if the employee has not been adequately trained. In *City of Canton, Ohio v. Harris,* the Supreme Court held that "inadequacy of police training may serve as the basis for section 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." 489 U.S. 378, 388, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Defendants argue that plaintiffs have not alleged deliberate indifference on the part of the County of Monterey and plaintiffs do not dispute this point in their opposition. The court concludes, therefore, that plaintiffs' third cause of action fails to state a claim and must be DISMISSED.

■ Plaintiffs' remaining claims assert constitutional violations by the individual defendants acting under color of law. Liability for constitutional wrongs arises, in the case of state officers, under 42 U.S.C. § 1983, and in the case of federal officers, under *Bivens*. To state a section 1983 claim, a plaintiff must allege (1) a violation of a right secured by the Constitution or laws of the United States (2) committed by a person acting under color of law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988). The basic elements are the same in *Bivens* actions.

■ Plaintiffs' second cause of action asserts a violation of plaintiffs' right to privacy under the First, Fourth, Fifth and Fourteenth Amendments by "improper publication of privileged communications to unauthorized third parties." FAC ¶ 53. The complaint alleges that defendants seized documents, knowing them to be subject to the attorney-client privilege and disclosed those documents to unidentified third parties.

Plaintiffs have not cited a case that elevates government disclosure of confidential communications to a constitutional deprivation. Aversion to the jurisprudential morass that has grown up around the Supreme Court's discovery of "zones of privacy" emanating from "penumbras" in the Bill of Rights, see *Griswold v. Connecticut,* 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), may explain this. In any event, authority *does* exist for constitutional protection of the "individual interest in avoiding disclosure of personal matters," *Whalen v. Roe,* 429 U.S. 589, 599, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977). But there is little clear guidance on the scope of such protection. As the Ninth Circuit put it: "Though often noted, this interest has been infrequently examined; as a result its contours remain less than clear." *Davis v. Bucher,* 853 F.2d 718, 719 (9th Cir.1988) (finding no section 1983 violation in officer's exhibiting nude photographs of inmate's wife and declining to consider scope of "confidentiality branch" of constitutional right to privacy). See also *Scheetz v. The Morning Call, Inc.,* 946 F.2d 202, 206–07 (3d Cir.1991) (noting that "the contours of the confidentiality branch are murky" and concluding that information contained in a police report is not protected).

The court need not resolve the substantial question whether disclosure of plaintiffs' attorney-client communications implicates a constitutional right. This is because, whatever the scope of the right, it is clear that public disclosure is an essential element of any deprivation. Here, plaintiffs have failed to plead facts supporting any inference that such disclosure occurred. Plaintiffs' complaint simply states, without any support, that defendants "subjected Plaintiffs' private papers and documents to scrutiny and publication by third parties" and "failed to take any precautions *** to preserve the confidentiality" of such material. FAC ¶¶ 51, 53. Plaintiffs' opposition papers argue that "it cannot be presumed *** that these communications were not publicly disclosed." Mem in Support of PlOpp

(Doc 31) at 3. Plaintiffs, however, ask the court to presume just the opposite—that material *was* publicly disclosed—and offer no factual basis for such an assumption. Therefore, plaintiffs' second cause of action is DISMISSED with leave to amend.

### III

Plaintiffs' fifth and seventh causes of action assert violations of plaintiffs' Fourth Amendment rights based on (1) the scope of the search warrant and (2) transfer of custody of seized items pursuant to an administrative subpoena. The latter appears to be the heart, if not the whole body, of this case. The court will address these claims in turn.

### A

■ Plaintiffs allege that "[d]efendants seized and removed from the premises items which were even beyond the scope of the already overbroad search warrant ***." FAC ¶ 29. The complaint, however, provides no further factual allegations in support of this claim. Defendants argue that in failing to identify any *specific items* that were seized beyond the scope of the warrant, plaintiffs have not met the basic pleading requirement of giving fair notice of the claim and the grounds on which it rests. See *Yamaguchi v. United States Dept. of Air Force*, 109 F.3d 1475 (9th Cir.1997) (explaining basic pleading requirements).

The court agrees. Plaintiffs have examined the warrant and the inventory list of items seized. In order to provide adequate notice to defendants, plaintiffs must, at a minimum, specify items on the inventory that allegedly exceed the scope of the warrant. But the complaint contains no more than a conclusory statement that the seizure exceeded the warrant. This aspect of plaintiffs' Fourth Amendment claim must, therefore, be DISMISSED.

### B

Plaintiffs' remaining Fourth Amendment claims involve the transfer of custody of seized items from local officials to the FBI pursuant to an administrative subpoena.

Plaintiffs allege constitutional violations in that (1) the transfer occurred before judicial authorization and (2) the transfer exceeded the scope of the subpoena.

These claims raise a novel issue. As noted above, the question is what protection, if any, does the Fourth Amendment provide plaintiffs from federal administrative subpoenas directing state and local officials to produce seized items? As explained below, the court concludes that the Fourth Amendment does not permit unfettered use of such subpoenas, and that when the interests of the owner of requested documents and the party to whom the subpoena is directed do not converge, special procedures are necessary to protect the owner's Fourth Amendment rights.

■ Federal officials obtained the subpoena issued in this case pursuant to 21 U.S.C. section 876(a). This section of the Controlled Substances Act provides the Attorney General with broad power in drug investigations to "subpena [sic] witnesses, compel the attendance and testimony of witnesses, and require the production of any records *** relevant or material to the investigation." 21 U.S.C. § 876(a). This power is not unchecked, however. Under the Fourth Amendment, the target of an administrative subpoena is entitled at a minimum to a judicial determination that (1) the subpoena is issued for a congressionally authorized purpose, the information sought is (2) relevant to the authorized purpose and (3) adequately described, and (4) proper procedures have been employed in issuing the subpoena. See *United States v. Sturm, Ruger & Co.*, 84 F.3d 1, 4 (1st Cir.1996).

There is no question that if the administrative subpoena had been served upon *plaintiffs* then these Fourth Amendment protections would apply. See *Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415, 104 S.Ct. 769, 78 L.Ed.2d 567 (1984). In this case, the fact that the subpoena was directed not to plaintiffs but to local officials who had previously seized the items in

question is relevant in two respects. First, it raises the question whether plaintiffs had any protectible interest in items already in official custody. Second, it suggests that if such an interest existed, plaintiffs were deprived of the ability to protect that interest. Unlike the owner of documents to whom a subpoena is directed in the ordinary case, plaintiffs here had no opportunity to object to enforcement and demand a judicial evaluation of the subpoena.

Defendants argue that the administrative subpoena did not implicate plaintiffs' Fourth Amendment rights because plaintiffs had no privacy interest in the items post seizure. The general rule is that a "search" occurs when an expectation of privacy that society is prepared to consider reasonable is infringed. *United States v. Jacobsen*, 466 U.S. 109, 113, 104 S.Ct. 1652, 80 L.Ed.2d 85 (1984). Defendant McKinley's supplemental brief states: "Any expectation of privacy that plaintiffs may have had in the items was lost upon the issuance of the search warrant for the Property, the subsequent search of the Property pursuant to the warrant and the resulting seizure of the items." Def McKinley's Supp Br in Support of Motion to Dismiss (Doc 37) at 3.

This broad proposition does not follow from the cases defendants cite. *United States v. Holzman*, 871 F.2d 1496 (9th Cir.1989), and *United States v. Thompson*, 837 F.2d 673 (5th Cir.1988), both involved subsequent searches of items seized from the person of an arrestee and lawfully inspected at the time of seizure. *Holzman* and *Thompson* applied the rules relating to search and seizure of items incident to a lawful arrest to reach the conclusion that initial inspection of items—in *Holzman*, an address book, and in *Thompson*, a set of keys—eliminated the owner's privacy interests in those items. The court in *Thompson* noted that "[o]nce property has been seized with proper justification and is *in plain view* of governmental officials, the owner no longer has a reasonable expectation of privacy with respect to that proper-

ty, and it may be seized without a warrant." 837 F.2d at 675 (emphasis added).

This logic, however appropriate in the case of personal effects in an arrestee's possession at the time of detention, does not apply with equal force in the present case, in which two truckloads of documents and other items were removed from the plaintiffs' premises and stored in a warehouse. The sheer volume of items seized belies the notion that these items were in plain view of law enforcement custodians or that the initial search completely eliminated plaintiffs' expectation of privacy in the items.

Defendants urge the court to extract from *Holzman* and *Thompson* the rule that a reasonable expectation of privacy ceases to exist *whenever* items are removed into government control pursuant to a warrant or other lawful means. The court declines to accept a proposition that would so vitiate the protections of the Fourth Amendment. Where, as here, items were seized pursuant to a warrant, plaintiffs retained the right to challenge the validity of the warrant or argue that certain items were beyond its scope. There is no reason they should not continue to possess that right with respect to further inspection and use of the seized items by other government agencies for other purposes. Defendants are therefore incorrect to argue that plaintiffs retained no expectation of privacy in the seized items and that the Fourth Amendment was not implicated by the administrative subpoena.

As noted above, the Fourth Amendment places minimum requirements of definiteness and reasonable relevance on administrative subpoenas. The difficulty in this case is that enforcement of those requirements is bound up with the right of an aggrieved party to challenge the subpoena's validity. As one court has explained:

An administrative subpoena is not self-executing and is therefore technically not a "search." It is at most a constructive search, amounting to no more than

a simple direction to produce documents, subject to judicial review and enforcement. Thus, unlike the subject of an actual search, the subject of an administrative subpoena has an opportunity to challenge the subpoena before yielding the information. In the course of that resistance, the Fourth Amendment is available to the challenger as a defense against enforcement of the subpoena.

*United States v. Sturm, Ruger & Co.,* 84 F.3d 1, 3 (1st Cir.1996) (citations omitted). As this description makes clear, the entire concept of Fourth Amendment protection from administrative subpoenas is dependent upon the assumption that the holder of rights will have the opportunity to exercise them before complying with the subpoena. Indeed, this concept is built into the statute under which the subpoena was issued in this case. That statute contemplates judicial enforcement in the case of "contumacy or refusal to obey." See 21 U.S.C. § 876(c).

In cases in which an administrative subpoena is directed to a party other than the holder of a privacy interest in the targeted items, the rights-holder will often *not* be afforded an opportunity to object on constitutional grounds. The instant case provides an example: Since the subpoena here was served on a cooperating law enforcement agency, it was for all practical purposes self-executing. State officials had no reason to resist compliance (and generally will not, barring conflict between state and federal investigations).

For Fourth Amendment protection from unreasonable administrative subpoenas to be meaningful, there must be some limit on the ability of law enforcement to obtain possession of items from third parties who have no incentive to object to enforcement. Plaintiffs in this case contend that federal and state officials conspired to conduct a fishing expedition through plaintiffs' records. This was allegedly accomplished by seizing items pursuant to a search warrant obtained in the state murder/robbery investigation and transferring those items to the FBI pursuant to an administrative subpoena for use in a federal drug investigation. Regardless of the truth of the charge in this case, unfettered use of administrative subpoenas would facilitate such conduct. Seizure of items, even if lawful, should not subject those items to unlimited government use; the court therefore concludes that the Fourth Amendment must provide appropriate limits.

In determining the scope of an individual's Fourth Amendment rights with respect to administrative subpoenas directed to third parties, the court finds instructive a line of cases concerning Internal Revenue Service summonses. The Internal Revenue Code provides the IRS with summons power similar to that exercised by the federal agents in this case. See 26 U.S.C. § 7602(a)(2). In *Reisman v. Caplin,* 375 U.S. 440, 442, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964), the Supreme Court considered the validity of a summons issued to taxpayers' accountants directing the production of "all audit reports, work papers and correspondence" pertaining to the taxpayers. The taxpayers' attorneys sought an injunction barring the accountants from complying with the subpoena on the basis that this would result in "an unconstitutional seizure of confidential and privileged documents for future use in \*\*\* criminal litigation \*\*\*." *Id.* at 444, 84 S.Ct. 508. The Court adopted a rule that "both parties summoned and *those affected by a disclosure* may appear or intervene before the District Court and challenge the summons by asserting their constitutional or other claims." *Id.* at 445, 84 S.Ct. 508. The Court determined that sanctions for noncompliance could only be obtained through an enforcement action which would be "an adversary proceeding affording a judicial determination of the challenges to the summons and giving complete protection to the witness." *Id.* at 446, 84 S.Ct. 508. These rules provided an adequate remedy at law, the court concluded, and thus injunctive relief was unnecessary.

In *Reisman*, the taxpayer had an opportunity to assert constitutional challenges to the subpoena before compliance; thus, the Court was not faced with the question of how to protect the taxpayers' right to make that challenge in the case of a subpoena issued to a disinterested third party. The Court's emphasis on the remedy of pre-enforcement challenge, however, led some courts in the wake of *Reisman* to consider special procedures in such cases. In *In re Cole*, 342 F.2d 5, 6 (2d Cir.1965), the IRS issued an administrative summons to taxpayers' bank seeking files and papers concerning the taxpayers. The bank did not object and examination of the records commenced immediately. Upon learning of the summons (it is unclear how), taxpayers' attorney requested that the bank cease compliance until the summons could be challenged in court. The district court, relying on *Reisman*, decided that "the inference to be drawn from the Supreme Court's enunciation of the right of [taxpayers'] attorneys to be heard is that they had the right to an advance notice of the issuance of the summons to which they were not parties." *Id.* at 7. The district court therefore conditioned the validity of a second summons to the bank on the giving of notice to the taxpayers. *Id.*

The Second Circuit did not decide whether the district court's inference from *Reisman* was correct. Instead, the court distinguished the case from *Reisman* on the basis that the documents sought were the property of the bank, not the taxpayer, and therefore the taxpayer did not have standing to object to the summons and notice was unnecessary. *Id.* This is consistent with the rule that no Fourth Amendment protection extends to items in which a party has no reasonable expectation of privacy. The Fourth Amendment was simply not implicated by the summons at issue. Thus, the Second Circuit's rejection of a notice requirement when the summoned documents were the property of third party in no way undercuts the validity of the district court's inference from *Reisman*, namely, that notice *is required* when a legitimate privacy interest exists.

When the Supreme Court revisited this area, the focus of controversy was the right of the taxpayer to intervene in an action seeking enforcement of a subpoena directing a third party to produce *its own* documents. In *Donaldson v. United States*, the Court adopted the Second Circuit's holding in *Cole* that a taxpayer may not intervene as of right "simply because it is his tax liability that is the subject of the summons." 400 U.S. 517, 530, 91 S.Ct. 534, 27 L.Ed.2d 580 (1971). The Court was careful to point out, however, that the summonses at issue were directed

> to a third person with respect to whom no established legal privilege, such as that of attorney and client, exists, and had to do with records in which the taxpayer has no proprietary interest of any kind, which are owned by the third person, which are in his hands, and which relate to the third person's business transactions with the taxpayer.

*Id.* at 523, 91 S.Ct. 534. In other words, as the Court had earlier upheld against Fourth Amendment challenge such a summons directed to a third-party bank, there was "no constitutional issue in the case." *Id.* at 522, 91 S.Ct. 534.

At present, of course, the court is concerned with an administrative subpoena directed to a third party for production of documents in which the plaintiffs *do* hold a proprietary interest or privilege. Put another way, the instant case is distinguishable from *Donaldson* in that plaintiffs' reasonable expectation of privacy in the records sought brings the Fourth Amendment into play. The proper approach, therefore, can be inferred from *Reisman*. The emphasis in that case on the importance of the taxpayer's right to a pre-enforcement adversary proceeding in federal court affording the opportunity for constitutional challenge and complete protection of the witness leads the court to conclude that notice and a right to intervene are mandated by the Fourth Amendment whenever a subpoena seeks records

in which an individual holds a proprietary or privilege interest.

This conclusion is bolstered by the reaction of Congress to *Donaldson.* That case, decided on statutory grounds, was superseded in 1976 when Congress amended the tax code to provide certain checks on the use of third-party summonses. This development has been described by the Second Circuit:

> Recognizing that the third party could raise questions as to relevance and other issues bearing on the privacy rights of the person to whom the records pertained, the legislators nonetheless concluded that those issues often would be less vigorously pursued by the third party than by the person whose interests were at stake ***. The solution, embodied in § 7609, was to *require IRS to give prompt notice to the person to whom the records pertain, and to allow that person to stay production of the records by the third party and to intervene in any court proceeding for enforcement of the summons.* The new procedure was not designed to give the taxpayer new substantive rights, but only to provide an early opportunity for him, as the person with the greatest interest in protecting existing substantive rights, to secure recognition of those rights.

*United States v. New York Telephone Co.,* 644 F.2d 953, 956–57 (2d Cir.1981) (emphasis supplied). This statutory protection in cases in which the Fourth Amendment is inapplicable mirrors the protection the court concludes is necessary when Fourth Amendment interests are implicated by a third-party administrative subpoena.

In sum, it is beyond dispute that the Fourth Amendment places significant limits on administrative subpoenas. In the ordinary case, these limits are enforced by the holder of privacy interests in targeted documents before compliance. There, additional protection is unnecessary. When a subpoena is directed to a party other than the holder of the privacy interests, however, the holder's right to resist compliance, practically speaking, disappears.

In such cases, officials can obtain documents without a judicial determination that the subpoena meets the minimum constitutional requirements. Such a result is constitutionally impermissible.

■ Therefore, the court concludes that in cases in which the holder of a privacy interest has no reasonable opportunity to object to enforcement of an administrative subpoena—as is the case when a subpoena issues to a third party in custody of the rights-holder's property—the Fourth Amendment requires advance notice and an opportunity to request a *pre-enforcement* judicial determination that the "inquiry is within the authority of the agency, the demand is not too indefinite and the information sought is reasonably relevant." See *United States v. Morton Salt Co.,* 338 U.S. 632, 652, 70 S.Ct. 357, 94 L.Ed. 401 (1950).

■ Obviously, defendants gave plaintiffs no pre-enforcement notice or opportunity to challenge the administrative subpoena in this case. The court concludes that such lack of notice can form the basis for a Fourth Amendment claim under section 1983 or *Bivens.*

Whether in this case lack of notice affords plaintiffs a claim against the defendants at bar is another matter. Defendants here may be entitled to qualified immunity if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). While the court has concluded that plaintiffs' seventh cause of action states a claim for violation of Fourth Amendment rights under color of law with respect to the administrative subpoena, the extensive analysis required to come to this conclusion illustrates that those rights were probably not clearly established at the time of the alleged violation. The court leaves that issue to another day, after further briefing and consideration by the parties and the opportunity for plain-

tiffs to amend their complaint in light of the foregoing.

## IV

In summary, plaintiffs' first, second, third, sixth and eight causes of action are DISMISSED. Plaintiffs' fifth and seventh causes of action state a claim against the individual federal and local law enforcement defendants under *Bivens* and section 1983, respectively. The fourth cause of action asserting municipal liability under section 1983 also remains. These claims are based on a violation of the Fourth Amendment stemming from defendants' failure to provide notice and opportunity for pre-enforcement challenge of the federal administrative subpoena. Plaintiffs are directed to file a second amended complaint consistent with the directions herein and, within a reasonable time after service of the second amended complaint, the parties shall contact the court to schedule a case management conference.

IT IS SO ORDERED.